## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 4108 | **DATE** | 1/5/2005 |
| **CASE TITLE** | BLENDER vs. AMERICAN FEED AND FARM SUPPLY, INC. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] American's summary judgment motion [12-1] is granted as to the $5000 advisory fee and denied as to the success fee claim. Summary judgment is granted in favor of plaintiff David A. Blender d/b/a Mustang Capital, LLC, and against defendant American Feed and Farm Supply, Inc. in the amount of $225,000 on the success fee claim. ENTER MEMORANDUM OPINION AND ORDER.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | DEC X 7 2005 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 1/6/2005 | |
| CB | courtroom deputy's initials | 2005 JAN -5  PM 12:23 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DAVID A. BLENDER, doing business as MUSTANG CAPITAL, LLC, | ) ) ) |
| Plaintiff, | ) ) No. 04 C 4108 |
| v. | ) ) Suzanne B. Conlon, Judge ) |
| AMERICAN FEED AND FARM SUPPLY, INC., | ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

David Blender ("Blender") d/b/a Mustang Capital, LLC ("Mustang") sues American Feed and Farm Supply, Inc. ("American") for breach of contract. Specifically, Blender contends he is entitled to a $225,000 success fee and a $5000 monthly advisory fee under the parties' consulting contract. American removed this case from state court, and now moves for summary judgment under Fed. R. Civ. P. 56.

## BACKGROUND

The following facts are undisputed. Mustang provides consulting, advisory and intermediary services to locate third-party business financing sources for clients. American Facts at ¶ 2. American distributes and supplies agricultural, farm and ranch products. *Id.* at ¶ 3. On April 7, 2002, Mustang and American signed an agreement, providing:

> **FINANCING SERVICES**
> Advisor agrees to utilize "best efforts" in identifying, negotiating, and structuring debt and/or equity financing and/or strategic relationship(s) on behalf of The Company. The Company agrees to pay MUSTANG a cash success fee in the amount equal to three percent (3%) of any Senior Loan(s)* and five percent (5%) of any

1



> Equity* committed to The Company if The Company closes a transaction with a source whom MUSTANG interacts on behalf of The Company.
>
> **SUCCESS FEE PAYMENT**
> Success fees are due in full to the Advisor in the state of Illinois when the transaction is closed or funded (initially or fully). The Company authorizes the funding sources to pay MUSTANG the full success fee directly from the proceeds of any and all funding obtained as a result of MUSTANG's direct or indirect involvement.
>
> **TERMINATION PROVISIONS**
> This Agreement may be terminated by either party upon one party providing the other party 30 days prior written notice, however, termination of this Agreement by either party does not relinquish The Company's fiduciary responsibility and contractual obligations(s) to compensate Advisor upon successful purchase transaction, funding or additional financing with and all Advisor and non-Advisor identified lending, financing, investment, and funding sources or other such third-party financings with whom Advisor has interacted on The Company's behalf and shall remain in effect for a period of not less than one (1) year from the date of termination of this Agreement. If a transaction or an additional funding with any company, individual, or funding source with whom Advisor has interacted on The Company's behalf occurs within 12 months after the date of termination of this Agreement, the above noted success fee is immediately due and payable to Advisor.

*Id.* at ¶ 8; Blender Add'l Facts at Ex. 4. In addition, the agreement provided American would pay Mustang $5000 per month. American Facts at ¶ 7. Joseph Hahn, American's president, asked Blender to draft the agreement using plain language. *Id.* at ¶ 9. American made minor changes to the draft agreement, but never sought to add language regarding the term "interaction" as used in the agreement. Blender Add'l Facts at ¶¶ 8-9. Blender and American reviewed the termination provision language; American did not object to the language.[1] *Id.* at ¶ 13.

Before seeking a financing lender, Blender and American prepared a financing profile for American that did not identify American by name. American Facts at ¶ 11. The profile was sent to

---

[1] American's general response to this fact, "Defendant claims that the facts contained in paragraph 13 are a disputed issue of fact," fails to meet the requirements of Local Rule 56.1 because it provides no record citation to support the assertion. The fact is thus deemed admitted. L.R. 56.1.

2

potential funding sources; Blender was not authorized to disclose American's identity to the funding source until the funding source executed a confidentiality agreement, referred to as a Non-Disclosure Agreement ("NDA"). *Id.* at ¶ 12; Blender Resp. to American Facts at ¶ 12. Upon receipt of the signed NDA, Blender identified American as the client and provided American's full financial information to the potential lender. American Facts at ¶ 13. American was aware there was no language in the agreement specifying that Blender was required to have a signed NDA or identify American to the lending source to qualify for a termination success fee. Blender Add'l Facts at ¶¶ 22-23.

In May 2002, Blender contacted Bruce Walderson, a sales representative with Textron Financial Corporation's ("Textron") Chicago office, on American's behalf. *Id.* at ¶ 27. Walderson's initial response to Blender's call was favorable. *Id.* Blender had a previous working relationship with Textron's Ft. Worth, Texas office and initially contacted that office on American's behalf. *Id.* at ¶ 30. Blender ultimately received Walderson's name from a sales person in the Textron Dallas, Texas office. American Facts at ¶ 15. Walderson telephoned Blender and told him to contact James St. Clair, Walderson's boss. Blender Add'l Facts at ¶ 29. Accordingly, on May 21, 2002, Blender sent an e-mail to Walderson and St. Clair and attached the profile and NDA. American Facts at ¶ 14. On September 18, 2002, Walderson and St. Clair's employment with Textron terminated. *Id.* at ¶¶ 17-18. Blender did not reveal American's identity to Walderson and St. Clair because they did not sign and return the NDA. *Id.* at ¶ 16. Blender advised American he contacted Textron on its behalf. Blender Add'l Facts at ¶ 32. American was unaware of Textron as a potential lending source until Blender identified Textron to American. *Id.* at ¶ 33.

Between May and August 2002, Blender obtained NDAs and term sheet financing proposals from lenders other than Textron. *Id.* at ¶ 19. At American's request, Blender also assisted American's attempt to negotiate, structure and close financing with Sunrock Capital. *Id.* at ¶ 20. The Sunrock Capital loan fell through in August 2002 and did not close. *Id.* Blender did not identify Sunrock Capital as a potential funding source. Blender Add'l Facts at ¶ 35. American paid Blender a $170,343.32 success fee for his work on the Sunrock deal. *Id.* at ¶¶ 38-39. On August 12, 2002, Blender sent American a letter at American's request listing the funding sources with whom Blender had interacted on American's behalf, including a contact person and phone number for each source. American Facts at ¶ 21; Blender Resp. to American Facts at ¶ 21 and Exs. 5-6. Textron and Walderson were on the list. Blender Resp. to American Facts Ex. 6. American did not dispute the contents of Blender's list. Blender Add'l Facts at ¶ 46.

Blender did not have an exclusive agreement with American, and American was free to use services of other consultants in its effort to secure a lender. American Facts at ¶ 10. On August 23, 2002, American signed a contract with a second loan intermediary broker, Steve Clapp of Credit Access Corporation ("CAC"), located in Denver, Colorado. *Id.* at ¶ 22. American's contract with CAC specifically prohibited CAC from contacting any of the sources Blender identified in his August 12, 2002 letter, so that Blender would continue to have opportunities to put together a deal for American. *Id.* at ¶ 23. In mid-September, the CAC contract was modified to permit CAC to seek financing from any lenders except those with whom Blender had obtained signed NDA's, or lenders with whom Blender negotiated at American's request. *Id.* at ¶ 24.

On October 23, 2002, CAC contacted Gary Collins in Textron's Oswega, Oregon office; CAC and Collins compiled a written term sheet proposal from Textron to American. *Id.* at ¶ 25.

Collins never had any contact with Blender, nor was he aware of Blender's previous contacts with Walderson. *Id.* at ¶ 26. American did not accept Textron's October 23, 2002 term sheet. *Id.* at ¶ 27.

On October 24, 2002, American signed a consulting agreement with a third broker, Morris Anderson & Associates, Ltd. ("Morris"). *Id.* at ¶ 29. Robert Swett, Morris' consultant, recommended that American terminate its contract with Mustang to save $5000 per month in expenses. *Id.* at ¶¶ 30-31. On October 29, 2002, American sent Blender written notice that it was terminating their agreement. *Id.* at ¶ 32. As of October 29, 2002, none of the potential funding sources Blender contacted had any active or pending financing negotiations with American. *Id.* at ¶ 33. Blender stopped performing work for American shortly after receipt of the termination notice, and he did not send American an invoice for any November 2002 advisory services. *Id.* at ¶¶ 34-35. American paid all monthly $5000 retainer and expense invoices from April 2002 through October 31, 2002. *Id.* at ¶ 44.

In November 2002, Collins' boss, who was located in Textron's Alpharetta, Georgia office, informed Collins that Swett contacted another Textron sales representative in Alpharetta regarding financing for American. *Id.* at ¶ 36. Collins had previously proposed a Textron terms sheet; because American was located in Collins' territory, he worked with Swett to prepare a new term sheet financing proposal. *Id.* American accepted Textron's November 23, 2002 term sheet financing proposal and on February 18, 2003, Textron issued financing to American. *Id.* at ¶¶ 37-38. Blender did not negotiate, structure or close any financing with Textron on American's behalf. *Id.* at ¶ 41. American paid CAC a broker's commission as a result of its obtaining the initial Collins proposal. *Id.* at ¶ 42.

5

## DISCUSSION

### I. Summary Judgment Standards

Summary judgment is appropriate when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once a moving party meets its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56 (e); *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### II. Summary Judgment Motion

#### A. Success Fee

The crux of this dispute is whether Blender is entitled to a success fee under the termination provision of the parties' agreement. American argues the agreement is unambiguous and Blender is not entitled to a success fee under Illinois law because he was not the procuring cause of American's loan from Textron. Specifically, American contends it agreed to pay Blender a success fee if Blender successfully identified, negotiated, structured and closed new financing for American. Further, American asserts Blender could not interact to negotiate and structure a financing deal with any potential funding source until Blender obtained a signed NDA, or until American asked Blender to become involved with the negotiation and structuring of a deal with a funding source American

6

identified through its own efforts. Because Blender did not obtain a signed NDA from Textron, and because American did not close a financing transaction with Textron as a result of any contact or involvement of Blender's, American argues Blender did not earn a success fee pursuant to the contract termination provision. American concludes this court should find under Illinois law that the term "interaction" as used in the agreement means Blender had to procure the Textron loan to be entitled to the success fee.

In response, Blender argues the agreement's termination provision unambiguously provides he was to receive a success fee if American ultimately financed with a lender with whom Blender interacted on American's behalf. Blender contends there is no contractual language requiring Blender to be the procuring cause of the deal to recover a fee, nor is there contractual language requiring him to obtain a signed NDA from the lending source to recover his fee. Blender argues that Illinois' procuring cause doctrine does not apply to contracts that provide other bases for recovery.

The parties agree that Illinois law controls this contract dispute. The court must initially determine, as a matter of law, whether the contract language is ambiguous as to the parties' intent. *Quake Construction Inc. v. American Airlines, Inc.*, 141 Ill.2d 281, 288, 565 N.E.2d 990 (Ill. 1990). Contract provisions must be viewed as a whole to give effect to the parties' intent. *Schek v. Chicago Transit Authority*, 42 Ill. 2d 362, 247 N.E.2d 886, 888 (Ill. 1969); *Kerton v. Lutheran Church Extension Fund*, 262 Ill. App. 3d 74, 634 N.E.2d 16, 18 (Ill. App. 1994). "If no ambiguity exists, the parties intent must be derived . . . solely from the writing itself." *Quake*, 141 Ill.2d at 288; *see also Metalex Corp. v. Uniden Corp.*, 863 F.2d 1331, 1333 (7th Cir. 1988) (interpretation of an unambiguous contract is a question of law for the court; summary judgment should be granted based

on the plain meaning of the contract itself). When interpreting a contract, terms are to be given their plain and ordinary meaning. *Vill. of Glenview v. Northfield Woods, Water & Utility*, 216 Ill. App. 3d 40, 48, 576 N.E.2d 238, 244 (Ill. App. Ct. 1991). "Parties entering into an agreement are presumed to have used terms having no technical meaning . . . the words are to be construed according to their common understanding and common usage." *Id.*, (citations omitted). A contract is not ambiguous merely because the parties dispute the meaning of its terms. *Id.*

By asserting the term "interact" means Blender must be the procuring cause of the transaction, American reads limitations into the termination section of the agreement that do not exist. American's reliance on *Mirza v. Fleet Retail Finance, Inc.*, 354 F.3d 687 (7th Cir. 2004), *Modern Tackle Co. v. Bradley Indus., Inc.*, 11 Ill. App. 3d 502, 297 N.E.2d 688 (Ill. App. Ct. 1973) and the cases cited therein, is misplaced. In those cases, the broker or finder failed to demonstrate his services were the procuring cause of the transaction and thus no commission was awarded. American ignores the specific holding in *Modern Tackle*, however, that the broker or finder must be the procuring cause of the transaction "unless the contract specifies otherwise." *Modern Tackle*, 297 N.E.2d at 693. In *Modern Tackle* and *Mirza*, the procuring cause requirement was enforced to alleged oral agreements. When an agreement specifies a method for recovering fees or commissions that does not require the broker to be the procuring cause, the procuring cause rule is inapplicable.

Courts have consistently found the procuring cause rule inapplicable when a contract specifies other methods for fee recovery. For example, *Bass v. Banga*, 656 F. Supp. 312 (N.D. Ill. 1987), *aff'd*, 857 F.2d 1476 (7th Cir. 1988), involved a dispute regarding a real estate broker's commission. The written agreement between the parties provided a brokerage commission would be paid if a contract to purchase and sell property was executed within six months after termination

8

of the agreement "with a purchaser to whom it was offered during the period hereof." *Id.* at 313. The court rejected defendant's argument that the broker was not entitled to the commission because he was not the procuring cause of the eventual sale. *Id.* at 314-15. Relying on *Kokinis v. Kotrick*, 74 Ill. App. 3d 224, 392 N.E.2d 697 (Ill. App. Ct. 1979), the court found no procuring cause requirement in the contract. Accordingly, the court held the broker could recover under the contract, whether or not he was the procuring cause of the sale, because he "offered" the property to the party who purchased it within six months of the contract's expiration. *Id.* at 315-16.

In *Kokinis*, a real estate broker brought suit to recover a commission under the terms of an exclusive listing agreement for the sale of a motel. 392 N.E.2d at 698. The written agreement provided the broker would receive a commission if he procured a purchaser of the property, sold the property, or "if the property is sold to anyone . . . to whom it was submitted or sold after termination of this agreement to whom it was submitted or shown by [plaintiff] . . . during the term of this agreement." *Id.* at 700. Analyzing the broker's entitlement to a commission after termination of the agreement, the court rejected defendant's argument that the broker was not entitled to the commission because he was not the procuring cause of the sale. Noting the broker could recover under the contract if he submitted the property to the buyer within the specified time, whether or not he was the procuring cause of the sale, the court determined it need only decide whether the broker's actions constituted a "submission" of the property. *Id.* at 701-02. After consulting prior decisions interpreting the meaning of the word "submit," as well as definitions, the court found the term "submit" synonymous with the term "offer." *Id.* at 702-03. The court held the broker's mailing of a flyer, indicating an unidentified motel in the area was for sale and furnishing his name and telephone number, and his follow up telephone call to see if the buyer was interested in seeing the

9

property, were sufficient to constitute a submission or offer entitling him to the commission. *Id.*; *see also Grub & Ellis Co. v. Bradley Real Estate Trust*, 909 F.2d 1050, 1055-56 (7th Cir. 1990) (failure to procure is irrelevant when agreement expressly provides for commission payment without regard to agent's role in transaction); 56 Ill. Admin. Code 300.510(a) (*"absent an express agreement to the contrary,* an employee who is the procuring cause of a sale or other transaction is entitled to commission . . .") (emphasis added).

Here, nothing in the agreement required Blender to be the procuring cause of a deal in order to receive a success fee. Nor did the agreement define "interact" to mean Blender was required to identify, negotiate, structure and close a deal. On its face, the "Financing Services" language binding Blender to use his "best efforts" did not limit his right to recover a success fee to only those situations where he completed all of the identified tasks. In fact, Blender did not "identify" Sunrock Capital as a potential lender, nor did the deal close. Nevertheless, American paid his success fee based on his negotiation efforts. The fact American requested his assistance does not alter the analysis; the success fee did not depend on completion of a pre-defined set of tasks. In addition, the termination section of the agreement in and of itself anticipates Blender may be awarded a success fee whether or not he is around to complete all tasks necessary to close a deal.

The contract is unambiguous. The termination agreement clearly provides Blender was entitled to a success fee if: (1) American closed a transaction; (2) with a lender; (3) with whom Blender had interacted; (4) within 12 months after the agreement was terminated. It is undisputed that Blender communicated with Textron in at least two telephone calls and an e-mail on American's behalf. American argues the communications were not on its behalf because Textron did not know American's identity and there was no interaction because there was no signed NDA. These

arguments lack merit. Setting aside the agreement's undisputed silence concerning these "requirements," Blender's communications were clearly on American's behalf; there is nothing to suggest Blender's communications were for a purpose unrelated to American. It must be noted that American requested and received a list from Blender of the funding sources with whom he "interacted," Textron was on the list and American never disputed the list's contents.

Although Blender did not receive a signed NDA or negotiate with Textron, the agreement did not require those actions for the award of a success fee. It is undisputed that Blender identified Textron as a potential lending source, Blender advised American he had contacted Textron on its behalf, and American was unaware of Textron as a lending source until advised of Textron by Blender. Blender forwarded the NDA and American's blind profile to Textron and communicated with Textron's Texas and Illinois offices on American's behalf. He did not negotiate or close the deal. However, all that was required was interaction with the lending source during the agreement's tenure. American stretches the meaning of "interact" to reach beyond the agreement. Giving "interact" its ordinary and customary meaning, Blender clearly interacted with the lending source on American's behalf, and American secured financing with that lending source withing twelve months of the agreement's termination.

Accordingly, American's summary judgment motion on the success fee issue must be denied. Blender did not cross-file for summary judgment. Nevertheless, when there are no disputed issues of material fact, the district court may grant summary judgment *sua sponte* in favor of the non-moving party. *Jones v. Union Pacific Railroad Co.*, 302 F.3d 735, 740 (7th Cir. 2002). "The court may issue summary judgment *sua sponte* as long as the losing party is given notice and an opportunity to come forward with its evidence." *Id.* When a party moves for summary judgment,

11

*both parties* are on notice that summary judgment is under consideration. *Id.* In *Jones*, the moving party argued there were no genuine issues of material fact. Although the court agreed, it concluded that the undisputed facts warranted judgment in the non-movant's favor. *Id.* The same is true here. Summary judgment in favor of Blender on his claim for a termination success fee must be granted.

### B. Monthly Advisory Fee

Blender's complaint alleges he is entitled to a $5000 monthly advisory fee for November 2002. American moves for summary judgment on the monthly advisory fee claim, asserting it paid all advisory fees for which it was invoiced. It is undisputed that Blender stopped performing work for American shortly after receipt of American's termination notice, and he did not send American an invoice for November 2002 advisory services. It is undisputed that American paid all monthly $5000 retainer and expense invoices from April 2002 through October 31, 2002. Blender's response to summary judgment is devoid of any basis for recovery of a $5000 advisory fee for November 2002. Blender has failed to advance specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56 (e); *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999). American's summary judgment motion on Blender's claim for a $5000 advisory fee must be granted.

### CONCLUSION

American's summary judgment motion is granted as to the $5000 November 2002 advisory fee and denied as to the termination success fee. Summary judgment is granted in favor of Blender on the success fee issue.

January 6, 2005

ENTER:

Suzanne B. Conlon
United States District Judge